# UNITED STATES DISTRICT COURT
# DISTRICT OF NEVADA

BOOMJ.COM, a Nevada corporation, and LINLITHGOW a Nevada limited liability company,

    Plaintiffs/ Counterdefendants,

v.

GEORGE PURSGLOVE, an individual; DOES 1 through 50, inclusive, and ROE CORPORATIONS I through X, inclusive,

    Defendant/ Counterclaimant.

Case No. 2:08-CV-00496-KJD-RJJ

**ORDER**

Presently before the Court is Plaintiffs' Motion in Limine (#108) to exclude the report and testimony of Defendant's expert Drew Max. Defendant filed a response in opposition (#114) to which Plaintiffs replied (#116). Also before the Court is Plaintiffs' Motion in Limine (#109) to exclude the report and testimony of Defendant's expert Patrick Gannon. Defendant filed a response in opposition (#115).

I.  Background

Plaintiff Boomj.com is a Nevada corporation that developed a website aimed at appealing to Baby Boomers and Generation Jones. Defendant George Pursglove began working at Boomj on or about October 1, 2006. On or about November 14, 2006, Pursglove was named CEO of Boomj. In

his capacity as CEO, Pursglove was issued 3.4 million shares of Boomj stock. On or about October 25, 2007, Pursglove resigned his position with Boomj. Plaintiffs subsequently transferred all of Pursglove's shares to Plaintiff Linlithgow. The parties dispute whether Pursglove's shares were subject to a vesting term.

Plaintiffs, to establish their contention that Pusglove's Boomj stock was subject to vesting, produced an "Executive Agreement" between Pursglove and Boomj at the second deposition of Pursglove. All prior witnesses deposed by Plaintiff testified that Pursglove's agreement concerning employment and vesting was between Pursglove and Linlithgow. The Executive Agreement Plaintiffs produced expressly states Pursglove's stock is subject to vesting and it bears a signature resembling that of Pursglove.  Pursglove denied ever seeing or signing the Executive Agreement. Additionally, at Pursglove's prior deposition he testified that there are individuals who are capable of forging his signature.

To support his contention that the signature is not his, Pursglove hired handwriting expert Drew Max ("Max") to analyze the signature. The parties do not dispute that Max is an amply qualified expert. Max reached the professional opinion that the signature on the Executive Agreement was not Pursglove's. Max provided a report of his findings as required by Fed.R.Civ.P 26(a)(2)(B).  Plaintiffs contend that the report does not include all of the specifications required by Rule 26(a)(2)(B) and therefore should be excluded from evidence.

Pursglove, who argues his stock was not subject to a vesting term and he should be compensated for its value, hired expert Patrick Gannon ("Gannon") to calculate his damages in the form of the shares of common stock he purportedly owned. Gannon reached the conclusion that Pursglove's damages amounted to five million eight hundred thousand dollars and no cents ($5,800,000.00). In his calculation of Pursglove's damages, Gannon used the date January 15, 2008, which he found was the first day the stock at issue was traded.  Plaintiffs contend that Gannon did

not take into consideration 17 C.F.R. 230.144[1], which imposes a time and quantity restriction on the stock Pursglove would have been able to sell on January 15, 2008. It is not disputed that Gannon is a qualified expert nor that he provided a report in compliance with Rule 26(a)(2)(B).

II. Motion to Exclude the Report and Testimony of Defendant's Handwriting Expert Drew Max

Defendant's handwriting expert Max examined the signature on the Executive Agreement, which is the signature in question, and compared it to six (6) other documents which Pursglove confirmed bore his original signature. The only copy of the Executive Agreement that has been produced is a machine copy and thus Max notes that he reviewed a machine copy. In Max's Rule 26(a)(B)(2) report, he describes his examination process as follows:

> After examining the above documents I have reached the professional opinion the signature on the ... Executive Agreement, was not signed by ... George Pursglove. Using the principles of questioned document examination the evidence is strong and compelling as to this determination as there are 6 major dissimilarities between the questioned signature and the known samples.

Plaintiffs contend that Max's report is improper because he did not attach the documents he examined to his report and because Max's statement, "[u]sing principles of questioned document examination... there are 6 major dissimilarities between the questioned signature and known samples[,]" is not a significant enough basis for his opinions.

According to Fed.R.Civ.P 26(a)(2)(B), expert witnesses must provide a report which contains:

(i) a complete statement of all opinions the witness will express and the basis and reasons for them;

(ii) the facts or data considered by the witness in forming them;

(iii) any exhibits that will be used to summarize or support them;

(iv) the witness's qualifications, including a list of all publications authored in the previous 10 years;

(v) a list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition; and

(vi) a statement of the compensation to be paid for the study and testimony in the case.

---

[1] Plaintiffs' brief actually cited 17 C.F.R Part 144 but as Defendant pointed out that particular rule is not substantively tied to this claim and 17 C.F.R. 230.144 is most likely what Plaintiffs intended to reference.

Although Max's report does not take the precise form Plaintiffs desire, it plainly satisfies all of the Rule 26(a)(2)(B) requirements: (i) Max states his opinion that the signature on the Executive Agreement is not Pursglove's signature and that he reached that conclusion by comparing the Executive Agreement signature to the six other signatures - he also expressly explains that he used principles of questioned document examination and found six major dissimilarities between the questioned signature and the known samples; (ii) and (iii) Max lists all seven documents he used to form his opinion, all of which have been previously disclosed to Plaintiffs; (iv) and (v) Max included six pages of his qualifications and previous court testimony, and; (vi) the final page of the report details his professional fees. Additionally, Max has participated as a handwriting analysis expert witness in thirty-four (34) previous trials.

Plaintiffs contend that six (6) comparison documents were not attached to the expert report and that without the actual copies of the documents Max examined it is impossible to know whether Defendants provided Max with rogue copies with the intent to fool Max. This contention is unconvincing. As an expert witness for the Defendant, Max will testify at trial and be subject to cross examination. During cross examination, Plaintiffs will have the opportunity to confirm that the documents Max relied upon are the same as those which have been previously disclosed to Plaintiffs.

In addition to Fed.R.Civ.P. 26, Max's report must also be admissible under Fed.R.Evid. 702. Rule 702 requires that the expert's testimony rest on a reliable foundation. "The inquiry into reliability requires a court to examine whether an expert has 'good grounds' for his or her opinions." Daubert v. Merrell Dow Pharmaceuticals, 509 U.S. 579, 580 (1993). Daubert listed several factors that may be considered when determining whether the testimony of non-scientist experts is reliable. Daubert, 509 U.S. at 593-595. These factors are: (1) can the theory or technique be tested or has it been tested; (2) has the theory been subject to peer review or publication; (3) is there a known potential rate of error and are there standards controlling the technique's operation; and (4) if the theory or technique enjoys general acceptance within the relevant scientific community. Id.

The <u>Daubert</u> factors are "meant to be helpful, but not definitive" and "do not constitute a definitive checklist." <u>Kumho Tire Co. Ltd. v. Carmichael</u>, 526 U.S. 137, 151 (1999).  Additionally, the Court "must have considerable leeway in deciding in a particular case how to go about determining whether expert testimony is reliable." <u>Id.</u> Rule 702 "grants the district judge the discretionary authority, reviewable for its abuse, to determine reliability in light of the particular facts and circumstances of the particular case." <u>Id.</u> 526 U.S. at 158.

The Ninth Circuit and six other circuits have already addressed the admissibility of handwriting expert testimony and determined that handwriting expert testimony can satisfy the reliability threshold. <u>See</u> <u>United States v. Crisp</u>, 324 F.3d 261, 296-70 (4th Cir. 2003); <u>United States v. Mooney</u>, 315 F.3d 54, 63 (1st Cir. 2002); <u>United States v. Jolivet</u>, 224 F.3d 902, 906 (8th Cir. 2000); <u>United States v. Paul</u>, 175 F.3d 906, 911 (11th Cir. 1999); <u>United States v. Jones</u>, 107 F.3d 1147,1161 (6th Cir. 1997); <u>United States v. Valasquez</u>, 64 F.3d 844, 850-52 (3rd Cir. 1995); <u>United States v. Prime</u>, 431 F.3d 1147 (9th Cir. 2005); <u>United States v. Johnson</u>, 30 Fed.Appx. 685 (9th Cir. 2002).

For example, in <u>Johnson</u> the Ninth Circuit held:

"The handwriting expert compared known samples of Johnson's handwriting to the handwriting on the I-94 forms and to a handwriting exemplar given by Johnson. The government presented evidence that the handwriting expert was experienced and well-qualified, and his qualifications were subject to examination by defense counsel. Further, '[i]t is undisputed that handwriting analysis is a science in which expert testimony assists a jury.' <u>United States v. Fleishman</u>, 684 F.2d 1329, 1337 (9th Cir. 1982). The testimony was clearly relevant to Johnson's involvement in the alien smuggling scheme. It was not an abuse of discretion for the district court to admit the testimony of the handwriting expert." <u>Id.</u> 30 Fed.Appx. at 688-689.

Therefore, handwriting analysis is a tested theory, it has been subject to peer review and publication, there is a known potential rate of error and there are standards controlling the technique's operation, and it enjoys general acceptance within the relevant scientific community. <u>See Id.</u>; <u>See also</u> <u>Daubert</u>, 509 U.S. at 593-595.

Here, Max's report indicates he used handwriting analysis to reach his conclusion and it thus passes the reliability threshold set by Rule 702. Max compared the Employment Agreement signature

5

to six (6) other signatures and used the principles of questioned document examination to conclude that there are six (6) major dissimilarities between the questioned signature and the signatures known to be Pursglove's.

Plaintiffs' contention that Max failed to state his express methodology is incorrect. Max does not expressly use the word "compared" to describe how he examined the questioned signature to the known signatures, but it is clearly implied by his statement that he compared the documents using principles of questioned document examination. Max was not required to detail all the principles of handwriting analysis in his report. Lastly, while it is clear that knowing what the "6 major discrepancies" are would be helpful, the omission does not devastate the reliability of Max's testimony. The high probative value of the Max's testimony coupled with the ample demonstration of its reliability is a sufficient foundation for admissibility. Accordingly, the Court denies Plaintiffs' Motion in Limine (#108).

III.  Motion to Exclude the Report and Testimony of Defendant's Damages Calculation Expert Patrick Gannon

Pursglove hired Gannon, a Certified Public Accountant, Certified Valuation Analyst, an Accredited Business Valuator, and Certified Forensic Financial Analyst, to calculate his damages suffered in the form of the value of shares of common stock of Boomj he purportedly owned as of December 28, 2007. December 28, 2007, is the date that Boomj merged with Real Estate Services, Inc., a publicly traded corporation and thus is the date Pursglove's shares would have been converted to post-merger shares. Gannon calculated the average price of Boomj stock as of January 15, 2008, because Gannon determined that was the first day Boomj was publicly traded according to the OTC Bulletin Board. Gannon then multiplied the number of Pursglove's purported shares by the average value of the shares on January 15, 2008, to reach the value of the shares on a fully marketable basis. Next, he discounted that fully marketable basis value by taking in to consideration the restrictions of 17 C.F.R. 230.144 and other relevant quantitative and qualitative factors affecting fair market value.

Gannon reached the opinion that five million eight hundred thousand dollars and no cents ($5,800,000.00) was a "conservative" estimate of Pursglove's damages.

Plaintiffs argue that Gannon's testimony and report should be excluded from trial because (1) there is no basis for his use of January 18, 2008; (2) Gannon should have considered the value of Boomj shares on December 28, 2007[2]; (3) Gannon failed to take into consideration the time and quantity restrictions of Rule 144; and (4) "it is difficult to determine if other accountants would accept Mr. Gannon's theory of damages."

A quick reading of Gannon's report indicates that none of Plaintiff's concerns are credible. Gannon explains his reasoning for why and how he used January 18, 2008 as well as December 28, 2007. He also explicitly states that he did consider Rule 144: "the shares owned by Mr. Pursglove would likely have been restricted [...] in accordance with Rule 144." Next, Plaintiffs to not dispute that Gannon, a member of the American Institute of Public Accountants with extensive credentials, is a qualified expert. Gannon's report shows that he used plain methodical reasoning for his damages calculation and Plaintiffs have not provided an expert witness who disputes his calculation. All of this weighs in favor of determining that Gannon's calculation technique probably has general acceptance by other accountants. Further, the accuracy of Gannon's five million eight hundred thousand dollars and no cents ($5,800,000.00) estimate for this claim is for the jury to decide. Accordingly, the Court denies Plaintiffs' motion in limine (#109).

////
////
////
////
////

---

[2] On page two (2) of Plaintiffs' Motion in Limine (#109), Plaintiffs state, "Mr. Gannon fails to take into consideration the actual value of the stock on December 28, 2007." Plaintiffs ask on page eight (8) of the same motion, "What does the value of the stock on December 28, 2007 have to do with anything?"

IV.  Conclusion

Accordingly, IT IS HEREBY ORDERED that Plaintiffs' Motion in Limine (#108) is **DENIED**;

IT IS FURTHER ORDERED that Plaintiffs' Motion in Limine (#109) is **DENIED**.

DATED this 3rd day of June 2011.

_____
Kent J. Dawson
United States District Judge